## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID M. RAMIREZ, | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| JO ANNE B. BARNHART, | § | SA-06-CA-0152 OG (NN) |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:    **Hon. Orlando Garcia**
       **United States District Judge**

### I. Introduction

Plaintiff David Ramirez seeks review and reversal of the administrative denial of his application for Supplemental Security Income (SSI) by the Administrative Law Judge (ALJ). Ramirez contends that the ALJ erred by determining that he retained the residual functional capacity to do sedentary work.  Ramirez maintains the ALJ's decision is not supported by substantial evidence, requiring the District Court to reverse the decision of the defendant, the Commissioner of the Social Security Administration (SSA), denying him benefits.  Ramirez asks the District Court to reverse the decision and to render judgment in his favor.  In the alternative, Ramirez asks the District Court to reverse the decision and remand the case for further factual development.

After considering Ramirez's brief in support of his complaint,[1] the brief in support of the Commissioner's decision,[2] Ramirez's reply brief,[3] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring for disposition by recommendation all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's applications for benefits.[4]

## II. <u>Jurisdiction</u>

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. <u>Administrative Proceedings</u>

Based on the record in this case, Ramirez fully exhausted his administrative remedies prior to filing this action in federal court. Ramirez filed for SSI benefits on July 16, 2003, alleging disability beginning August 11, 2001.[5] The Commissioner denied the application

---

[1]Docket entry # 11.

[2]Docket entry # 14.

[3]Docket entry # 15.

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]SSA record, p. 63.

initially and on reconsideration.[6]  Ramirez then asked for a hearing before an ALJ.[7]  A hearing

was held before an ALJ on August 14, 2004.[8]  At the hearing, the ALJ questioned the impact

depression might have on Ramirez's complaints of chronic pain and ordered a psychological

examination.  The ALJ also granted a request by Ramirez's attorney for an EMG.  The ALJ

conducted a second hearing on January 21, 2005, after the results of the examinations were

available.[9]  The ALJ issued a decision on July 29, 2005, concluding that Ramirez is not disabled

within the meaning of the Social Security Act (the Act).[10]  Ramirez asked for review of the

decision on August 23, 2005.[11]  The SSA Appeals Council concluded on January 11, 2006, that

no basis existed for reviewing the ALJ's decision.[12]  The ALJ's decision became the final

decision of the Commissioner for the purpose of the District Court's review pursuant to 42

U.S.C. § 405(g).  Ramirez filed this action seeking review of the Commissioner's decision on

February 24, 2006.[13]

**IV.  Issue Presented**

> Is the ALJ's decision that Ramirez was not under a "disability," as
> defined by the Act, at any time through the date of the decision,

---

[6]*Id*. at pp. 24 & 33.

[7]*Id*. at p. 38.

[8]*Id*. at pp. 505-22.

[9]*Id*. at pp. 488-504.

[10]*Id*. at p. 11.

[11]*Id*. at p. 9.

[12]*Id*. at p. 5.

[13]*See* Ramirez's complaint, docket entry # 3.

supported by substantial evidence and does the decision comport
with relevant legal standards?

## V.  **Analysis**

### A. Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court
is limited to determining whether substantial evidence supports the decision and whether the
Commissioner applied the proper legal standards in evaluating the evidence.[14]  "Substantial
evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."[15]  Substantial evidence
"must do more than create a suspicion of the existence of the fact to be established, but 'no
substantial evidence' will be found only where there is a 'conspicuous absence of credible
choices' or 'no contrary medical evidence.'"[16]

If the Commissioner's findings are supported by substantial evidence, then they are
conclusive and must be affirmed.[17]  In reviewing the Commissioner's findings, a court must
carefully examine the entire record, but refrain from reweighing the evidence or substituting its
judgment for that of the Commissioner.[18]  Conflicts in the evidence and credibility assessments

---

[14]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[15]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d
162, 164 (5th Cir. 1983)).

[16]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[17]*Martinez*, 64 F.3d at 173.

[18]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court
is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the
Commissioner.).

4

are for the Commissioner and not for the courts to resolve.[19]  Four elements of proof are weighed

by the courts in determining if substantial evidence supports the Commissioner's determination:

(1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians,

(3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age,

education and work experience.[20]

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an

application for benefits, and is under a disability, is eligible to receive SSI benefits.[21]  The term

"disabled" or "disability" means the inability to "engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months."[22]  A claimant shall be determined to be disabled only if his physical or

mental impairment or impairments are so severe that he is unable to not only do his previous

work, but cannot, considering his age, education, and work experience, participate in any other

kind of substantial gainful work which exists in significant numbers in the national economy,

regardless of whether such work exists in the area in which the claimant lives, whether a specific

job vacancy exists, or whether the claimant would be hired if he applied for work.[23]

---

[19]*Martinez*, 64 F.3d at 174.

[20]*Id.*

[21]42 U.S.C. § 1382(a)(1) & (2).

[22]42 U.S.C. § 1382c(a)(3)(A).

[23]42 U.S.C. § 1382c(a)(3)(B).

**2. Evaluation Process and Burden of Proof**

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[24]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[25]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[26]  If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience.[27]  The second step involves determining whether the claimant's impairment is severe.[28]  If it is not severe, the claimant is deemed not disabled.[29]  In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[30]  If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience.[31]  If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work.[32]  If the claimant is still able to do his past work, the

---

[24]20 C.F.R. §§ 404.1520 and 416.920.

[25]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[26]20 C.F.R. §§ 404.1520 and 416.920.

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

claimant is not disabled.[33]  If the claimant cannot perform his past work, the Commissioner

moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities,

age, education, and work experience, to do other work.[34]  If the claimant cannot do other work,

he will be found disabled.  The claimant bears the burden of proof at the first four steps of the

sequential analysis.[35]  Once the claimant has shown that he is unable to perform his or her

previous work, the burden shifts to the Commissioner to show that there is other substantial

gainful employment available that the claimant is not only physically able to perform, but also,

taking into account his exertional and nonexertional limitations, able to maintain for a significant

period of time.[36]  If the Commissioner adequately points to potential alternative employment, the

burden shifts back to the claimant to prove that he is unable to perform the alternative work.[37]

**B. Findings and Conclusions of the ALJ**

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At

step one, the ALJ determined that Ramirez had not engaged in substantial gainful activity since

his alleged onset date.[38]  At step two, the ALJ determined that Ramirez has medically

determinable impairments due to disorders of the back, essential hypertension and major

---

[33]*Id.*

[34]*Id.*

[35]*Leggett*, 67 F.3d at 564.

[36]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[37]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[38]SSA record, p. 15.

depressive disorder.[39]  The ALJ characterized these impairments as severe.[40]  At step three, the

ALJ found that Ramirez's impairments, either singly or in combination, are not severe enough to

meet, medically equal or functionally equal one of the impairments listed in 20 C.F.R., Part 404,

Subpart P, Appendix 1 (Appendix 1).[41]  At step four, the ALJ found that Ramirez is unable to

perform any of his past relevant work and that he is restricted from doing the full range of light

work.[42]  At step five, the ALJ determined that Ramirez has no transferrable skills from any past

work, but that he could perform sedentary work.[43]  The ALJ also determined that a significant

number of jobs exists in the national economy that Ramirez can perform.[44]  Thus, the ALJ

concluded that Ramirez is not disabled as defined in the Act.[45]

## C.  Ramirez's Allegations of Error

Ramirez maintains that he has no capacity to perform substantial gainful activity, and

thus, he contends that the ALJ erred in determining that he had the residual functional capacity to

perform sedentary work.  Residual functional capacity is "the most [a claimant] can still do

despite [his] limitations."[46]  Specifically, Ramirez complains the ALJ failed to: (1) consider his

---

[39]*Id.* at p. 20.

[40]*Id.* at p. 15.

[41]*Id.*

[42]*Id.* at p. 14.

[43]*Id.* at p. 21.

[44]*Id.*

[45]*Id.*

[46]20 C.F.R. § 416.945(a)(1).

low average range of intellectual functioning with deficiencies in verbal and computational areas, (2) analyze and use findings from the Veteran's Affairs (VA) Health Care System, (3) include fatigue in his analysis of residual functional capacity, (4) include all of the impairments and associated limitations in the hypothetical question posed to the vocational expert, and (5) determine whether he could actually maintain employment in any of the jobs the ALJ identified that he could perform.  Because these complaints apply to the ALJ's step-five determinations, my discussion of the evidence focuses on that step.

In step five, the ALJ considers his step-four assessment of an applicant's residual functional capacity and the applicant's age, education, and work experience to determine whether the applicant can make an adjustment to other work.[47]  If the applicant can make an adjustment to other work, the ALJ will conclude that the applicant is not disabled.[48]  In this case, the ALJ determined that Ramirez is unable to perform his past relevant work—aircraft maintenance—because of the required lifting and prolonged standing, but that Ramirez has the residual functional capacity to perform sedentary work.[49]  The ALJ determined that Ramirez cannot do the full range of light work because Ramirez is limited in the following respects: Ramirez can stand and walk only 2 hours in an 8 hour work day and he has no limitation in the ability to sit.[50]  Ramirez's ability to push and pull is limited in the lower extremities.  Ramirez can never can climb ramps, stairs, ladders, scaffolds or ropes, and he can occasionally balance,

---

[47]*See* 20 C.F.R. § 416.920(a)(4)(v).

[48]*Id.*

[49]SSA record, p. 19.

[50]*Id.*

kneel, crouch, crawl or stoop.[51]  Ramirez has a marked limitation in the ability to carry out detailed instructions and respond appropriately to work pressures in a usual work setting.[52] Ramirez has a moderate limitation in the ability to understand and remember detailed instructions, exercise judgment on simple work-related decisions, and interact appropriately with the public and respond appropriately to changes in a routine work setting.[53]  Ramirez has a slight limitation in the ability to interact appropriately with supervisors and coworkers and understand, remember and carry out short simple instructions.[54]  Based on these limitations, the ALJ determined that Ramirez can perform sedentary work and that a significant number of jobs exist in the national economy that Ramirez can perform.[55]  Ramirez does not specifically challenge the ALJ's findings about his limitations, and thus, the only question in this case is whether Ramirez's limitations result in a complete inability to perform any substantial gainful activity. Although this is a close case, substantial evidence supports the ALJ's determinations.

That Ramirez can no longer perform his past work is not disputed.  The evidence shows that Ramirez injured his back on August 11, 2001 after he stepped in a hole in his brother's back yard.[56]  At that time, Ramirez was 41 years old and worked for Boeing as an aircraft mechanic.[57]

---

[51]*Id.*

[52]*Id.*

[53]*Id.*

[54]*Id.*

[55]*Id.* at p. 20.

[56]*Id.* at pp. 166 & 172.

[57]*Id.* at p. 172.

Two days after the accident, Dr. Dennis Oliver examined Ramirez and determined that Ramirez had lumbar strain.[58]  "[T]he word *lumbar* refers chiefly to the back of this part of the body, and even more frequently to the spine of this area; i.e., the spine lying in the lumbar region and composed of the five lumbar vertebrae."[59]  The five vertebrae are separated by intervertebral discs.[60]  Dr. Oliver prescribed medication and exercises for low back pain.[61]  Ramirez did not return to work, but instead, applied for short-term disability benefits.[62]  When Ramirez continued to complain about low back pain, Dr. Oliver prescribed physical therapy.  On September 9, 2001, Ramirez was assessed by a physical therapist and scheduled for physical therapy sessions.[63]  The discharge summary for those sessions, dated October 3, 2001, indicates that Ramirez attended 7 of 9 scheduled sessions.[64]  Ramirez continued to complain about pain, so Dr. Oliver scheduled Ramirez for a MRI.  A MRI or magnetic resonance imaging is "[a] complex electronic procedure for producing images of internal structures of the body."[65]  The results of the MRI, conducted on October 9, 2001, follow:

> T12-L1: Intervertebral disc demonstrates normal height and signal.  There is no

---

[58]*Id*. at p. 298.

[59]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. L-193-94 (Matthew Bender 2005).

[60]*See* ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES (Matthew Bender 2003), at Fig. 34-2.

[61]SSA record, pp. 297-301.

[62]*Id*. at p. 286.

[63]*Id*. at p. 145.

[64]*Id*. at p. 141.

[65]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. M-15 (Matthew Bender 2005).

evidence of disc protrusion or spinal canal narrowing.  However, a small anterior osteophyte[66] is present at this level on the right.  Spinal cord has normal terminus[67] and signal.

L1-2: No abnormality identified.

L2-3: No abnormality identified.

L3-4: No abnormality identified.

L4-5: Diffuse decreased signal activity is identified with diffuse disc bulging and encroachment on the neutral foramina bilaterally with secondary narrowing of the spinal canal due to the degenerative disc changes and diffuse disc bulging, as well as degenerative changes of the posterior facets.

L5-S1: No abnormality identified.

Impression:

Degenerating disc developing at L4-5 with diffuse approximately 5 mm of disc bulging and secondary narrowing of the spinal cord and neural foramina bilaterally.[68]

The disc referred to in the Impression—L4-5—is the disc between the fourth and fifth lumbar vertebrae (L4, L5).  Dr. Oliver then referred Ramirez to a pain specialist, Dr. Michael L. Murphy.[69]

Dr. Murphy's exam of Ramirez showed severe myofascial pain involving the left gluteus maxima/medius/minimus and sacroiliac fascia.[70]  The gluteus is "[o]ne of the three muscles of the buttock, i.e., the gluteus maximus, gluteus medius, or gluteus minimus."[71]  The sacroiliac

---

[66]An osteophyte is "[a]n outgrowth of bony tissue from a bone; . . . a spur of bone."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. O-122 (Matthew Bender 2005).

[67]Terminus means "[a]n ending of a structure."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. T-59 (Matthew Bender 2005).

[68]SSA record, p. 168

[69]SSA record, p. 166-67.

[70]*Id*.

[71]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. G-107 (Matthew Bender 2005).

12

joint "supports the spine and, therefore, the entire body above the hips."[72]  Dr. Murphy opined that Ramirez had lumbar degenerative disc disease with acute traumatic event causing nerve root irritation.[73]  He also opined that Ramirez had myofascial pain syndrome.  Myofascial pain syndrome is the "[i]rritation of the muscles and fasciae (membranes) of the back and neck causing chronic pain (without evidence of nerve or muscle disease)."[74]  Dr. Murphy scheduled Ramirez for a lumbar epidural steroid injection with myofascial trigger point injection.[75]

Ramirez underwent three lumbar epidural steroid injections—on December 18, 2001,[76] February 5, 2002,[77] and February 26, 2002.[78]  The record for the last injection indicates that Dr. Murphy would see Ramirez for a follow-up in the next week or two weeks, but the record contains no evidence of a followup appointment.[79]  Ramirez did visit with Dr. Oliver, however, on June 14, 2002, seeking completion of a form needed for insurance benefits.[80]  At that time, Ramirez continued to complain about back pain.  He told Dr. Oliver that the pain increased with any movement.  Dr. Oliver completed the form, but indicated that Ramirez had not been fully

---

[72]*Id*. at S-7.

[73]SSA record, p. 167.

[74]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. M-337 (Matthew Bender 2005).

[75]SSA record, p. 167.

[76]*Id*. at p. 163-165.

[77]*Id*. at p. 160-62.

[78] *Id*. at p. 157-59.

[79]*Id*.

[80]*Id*. at pp. 182 & 248.

compliant with recommended treatment.[81]  The record does not contain notes for a subsequent

visit, perhaps because Ramirez exhausted his short-term disability benefits.[82]

The only disputed issue in this case is whether Ramirez's injury and other impairments

prevent him from doing all work.  Most of the notes of Ramirez's visits with Dr. Oliver are

illegible, making it is impossible to tell whether Dr. Oliver commented on Ramirez's ability to

work.  In any event, Ramirez does not point to any note where Dr. Oliver assessed his ability to

work.  The record, however, contains seven Short Term Disability Plan Attending Physician's

Statements completed by Dr. Oliver—dated August 29, 2001,[83] September 11, 2001,[84] September

18, 2001,[85] October 10, 2001,[86] November 1, 2001,[87] December 3, 2001,[88] and February 8, 2002.

On each of these forms, Dr. Oliver indicated that Ramirez had a Class 5 physical impairment,

defined as "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity."

This evidence contradicts the ALJ's determination that Ramirez can do sedentary work because it

indicates that Dr. Oliver opined that Ramirez was incapable of minimal (sedentary) activity.

The record does not indicate that Ramirez sought further treatment for his back.  The

---

[81]*Id*. at p. 248.

[82]*See id*. at 400 (Ramirez tells Dr. Connolly that he was treated with medication and physical therapy until he ran out of health insurance).

[83]*Id*. at p. 286.

[84]*Id*. at p. 283.

[85]*Id*. at p. 278.

[86]*Id*. at p. 273.

[87]*Id*. at p. 268.

[88]*Id*. at p. 263.

SSA, however, sent Ramirez for a consultative evaluation on September 6, 2003.[89]   The

evaluation was conducted by Dr. Leverne Prosser.[90]   Ramirez told Dr. Prosser that he could not

sit for more than two to three hours at a time without having to move and that he could not carry

heavy objects more than 10 to 20 pounds.[91]   Dr. Prosser reported that Ramirez suffers from

chronic back pain, mild left ankle pain, and hypertension.[92]   She further indicated that Ramirez's

range of motion is limited in his neck and low back.[93]   She commented, however, that "[w]hen

not actually concentrating on the range of motion on his neck it seems full but when I'm actively

measuring it, it is limited."[94]   She also reported that Ramirez stated that he can walk short

distances—two or three blocks—without much difficulty, and that he can sit for three to four

hours without much pain.[95]   Dr. Prosser's examination indicated that Ramirez's left ankle was

normal, but that Ramirez had some residual pain from twisting his ankle when he stepped in the

hole in his brother's back yard.[96]   Finally, Dr. Prosser reported that Ramirez's hypertension was

---

[89]*See id*. at p. 486 (referring to Dr. Prosser's exam as a consultative examination) & p. 214 (referring to Ramirez as "the claimant" and indicating that Dr. Prosser advised Ramirez that she was not his treating physician and that she was not entering into a doctor/claimant relationship).

[90]*Id*. at p. 214.

[91]*Id*.

[92]*Id*. at p. 215.

[93]*Id*.

[94]*Id*.

[95]*Id*.

[96]*Id*.

controlled by medication.[97]

Dr. Prosser's evaluation supports the ALJ's determination because it indicates that

Ramirez can perform sedentary work.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.[98]

Dr. Prosser's evaluation indicates that Ramirez can perform this type of work because she

reported the Ramirez can walk short distances without much difficulty and that he can sit for

three to four hours without much pain.

After Dr. Prosser's examination, Ramirez sought treatment for his back problems.  On

September 17, 2003, Ramirez was seen by Roberto Corral—a physician's assistant—at WellMed

Medical Management.[99]  During that visit, Ramirez complained about chronic pain to his neck,

low back, hips and legs.[100]  Corral ordered X-rays and lab work.  The X-rays of Ramirez's

cervical spine—the "part of the spine (vertebral column) composed of the seven vertebrae of the

neck"[101]—showed limited evaluation of C6 and C7, no evidence of fracture or subluxation,[102] and

---

[97]*Id.*

[98]20 C.F.R. § 1567.

[99]*Id.* at pp. 223-25.

[100]*Id.*

[101]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. C-175 (Matthew Bender 2005).

[102]Subluxation means "dislocation of a bone which is less than complete, i.e., a partial dislocation." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. S-347 (Matthew Bender 2005).

mild degenerative changes at the C5 and C6 levels.[103]   Results of X-rays of Ramirez's lumbar

spine showed normal vertebral body height and alignment, small osteophytes in the lower lumbar

spine, maintained disc space height, and mild degenerative changes.[104]   Results of X-rays of

Ramirez's hips showed no evidence of fracture, dislocation, focal lesion, or significant

degenerative changes.[105]   Ramirez saw Corral again on September 22, 2003.[106]   Corral prescribed

Robaxin and Motrin for back and neck pain.[107]   On December 4, 2003, Ramirez returned,

reported that he been to the VA hospital, and complained that the Robaxin made him dizzy.[108]

Corral changed the prescription for Robaxin to Napropsyn.[109]   This evidence documents

Ramirez's claim to suffer from chronic pain, but it has little bearing on the ALJ step-five

determination because Corral did not assesses Ramirez's ability to do work and because the ALJ

acknowledged that Ramirez may have to work with more pain than the average worker.[110]

 Ramirez's records from the VA hospital show that he complained about depression on

---

[103]SSA record, p. 230.

[104]*Id*. at p. 231.

[105]*Id*. at p. 232.

[106]*Id*. at p. 221.

[107]*Id*.

[108]*Id*. at p. 219.

[109]*Id*.

[110]*Id*. at p. 18.

September 18, 2003.[111]  Ramirez was examined on September 30, 2003.[112]  The examining

physician diagnosed Ramirez as having lumbosacral spine disc disease with spinal stenosis.[113]

Spinal stenosis is a "narrowing of the spinal canal (the long channel within the bony structure of

the spine), usually as a result of hypertrophic (pertaining to abnormal enlargement) degenerative

changes of the bony structures."[114]  The physician also diagnosed Ramirez as having cervical

spine disc disease without radiculopathy, but no joint disease.[115]  Radiculopathy refers to "[a]ny

disease or abnormality of a dorsal or ventral (sensory or motor) spinal nerve root from the point

where it merges with the spinal cord (or brain stem) to the point where it joins its companion root

(a motor or a sensory) to form a spinal nerve."[116]  The physician noted that Ramirez had mild to

moderate hypertension without hypertensive complications.[117]  Ramirez did not return to the VA

hospital again until February 16, 2005, for depression screening.[118]  This evidence has some

bearing on the ALJ's analysis because it shows that Ramirez did not seek further treatment for

his back or his hypertension.

     In the meantime, the SSA sent Ramirez's medical records for a functional capacity

---

[111]*Id*. at p. 376.

[112]*Id*. at p. 381.

[113]*Id*.

[114]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. S-243 (Matthew Bender 2005).

[115]SSA record, p. 385.

[116]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. R-10 (Matthew Bender 2005).

[117]SSA record, p. 385.

[118]*Id*. at p. 460.

assessment.[119]  The assessing physician determined that Ramirez can occasionally lift and/or carry 50 pounds, frequently lift/carry 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday.  The physician also opined that Ramirez is not limited in his ability to pull and/or pull, other than as reported for lifting and/or carrying.  This assessment supports the ALJ's determination that Ramirez can do sedentary work because it indicates that Ramirez can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and because sedentary work involves sitting, occasional walking and standing, and occasional lifting no more than 10 pounds.

The VA also sent Ramirez for neurological evaluation and an electromyography (EMG) before he returned to the VA hospital.  An EMG is the "production and interpretation of tracings (i.e., visual recordings) of the electrical changes in active muscles."[120]  Ramirez's attorney requested this test at the first hearing.  The results of the EMG were consistent with an acute right L5 and S1 radiculopathy.[121]  The neurologist who assessed the results—Dr. H. Gordon—opined that Ramirez has no difficulty sitting, standing, handling objects, hearing or speaking, but will have difficulty with prolonged walking and lifting objects over 30 pounds.[122]  Dr. Gordon determined that Ramirez can occasionally lift and/or carry 20 pounds, frequently lift/carry 10

---

[119]Id. at pp. 233-41.

[120]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. E-53 (Matthew Bender 2005).

[121]See SSA record, p. 409 (referring to the EMG done on Aug, 24, 2004).

[122]Id. at p. 410.

pounds, and stand and/or walk (with normal breaks) for at least 2 hours in an 8-hour workday.[123]

Dr. Gordon opined that Ramirez's impairment does not affect his ability to sit, but that Ramirez

is limited in his lower extremities in the ability to push and/or pull (including operation of hand

and/or foot controls).[124]  Dr. Gordon also opined that Ramirez cannot climb ramps, stairs,

ladders, ropes, or scaffolds, but that he can occasionally balance, kneel, crouch, crawl, or

stoop.[125]  Dr. Gordon reported that he found no evidence of back spasms, but reported that

Ramirez has a loss of motion in the lumbar spine rated at 50% of normal.[126]  Dr. Gordon also

reported the Ramirez has no atrophy, motor, sensory or reflex changes.[127]  He further reported

that Ramirez has full weight-bearing status, but that Ramirez has difficulty secondary to pain

with heel-to-toe walking, squatting, hopping, and tandem walking.[128]

Dr. Gordon's assessment supports the ALJ's step-five determination because sedentary

work requires sitting and Dr. Gordon opined that Ramirez's impairment does not affect his

ability to sit.  The assessment also supports the ALJ' determination because sedentary work

requires occasional lifting or carrying no more than 10 pounds and Dr. Gordon determined that

Ramirez can frequently lift/carry 10 pounds.  It further supports the ALJ's determination because

sedentary work requires some walking and standing, and the assessment reflects that Ramirez can

[123]*Id*. at pp. 413-17.

[124]*Id*.

[125]*Id*.

[126]*Id*. at p. 410.

[127]*Id*.

[128]*Id*.

stand and/or walk (with normal breaks) for at least 2 hours in an 8-hour workday.

The VA also sent Ramirez for a psychological assessment before he returned to the VA hospital.  The ALJ directed this assessment at Ramirez's first hearing.  The evaluation was conducted by Dr. Sean G. Connolly.  Dr. Connolly summarized the results of his evaluation as follows:

> Psychological assessment indicates Low Average intelligence, and comparable academic skills. . . . His personality profile clearly indicative of a mood disorder, secondary to his back injury and the impact it has had on functioning, productivity, employability, activity level and relationships.[129]

Dr. Connolly also made the following assessments about Ramirez's ability to do work-related activities:  Slight restriction in the ability to understand and remember short, simple instructions.[130]  Slight restriction in the ability to carry out short simple instructions.[131]  Moderate restriction in the ability to understand and remember detailed instructions.[132]  Marked restriction in the ability to carry out detailed instructions.[133]  Moderate restriction on the ability to make judgment on simple work-related decisions.[134]  Moderate restriction in the ability to interact appropriately with the public.  Slight restriction in the ability to interact appropriately with

---

[129]*Id*. at p. 404.

[130]*Id*. at p. 406.

[131]*Id*.

[132]*Id*.

[133]*Id*.

[134]*Id*.

supervisor(s).[135]  Slight restriction in the ability to interact with co-workers.[136]  Marked restriction

in the ability to respond appropriately to changes in work pressures in a usual work setting.[137]

Moderate restriction in the ability to respond appropriately to changes in a routine work

setting.[138]  Dr. Connolly's assessment supports the ALJ's determinations because they mirror Dr.

Connolly's assessment of Ramirez's ability to do work-related activities.

      During the second hearing, the ALJ asked a vocational expert whether any jobs existed in

the national economy that a person with Ramirez's physical limitations and mental restrictions

could perform.  The vocational expert answered, "yes."[139]  When questioned about what type of

jobs existed, the vocational expert classified the jobs as sedentary work and gave the following

examples: switchboard operator, payroll clerk, and information clerk.[140]  This evidence supports

the ALJ's determination because it shows that Ramirez can do sedentary work.

      Finally, Ramirez testified during the second hearing that he was unable to get out of bed 3

to 4 times a week.[141]  He also stated that he needed help to put on his pants and shoes and help

cleaning himself after going to the bathroom.[142]  He further testified that he can only sit for 15

---

[135]*Id*. at p. 407.

[136]*Id*.

[137]*Id*.

[138]*Id*.

[139]*Id*. at p. 494.

[140]*Id*. at p. 495.

[141]*Id*. at p. 501.

[142]*Id*. at p. 502.

minutes at a time and that then he has to stand up for 10 minutes before sitting down again.[143]  He

explained that he has to lay down for one hour for every 15 minutes of standing and 10 minutes

of sitting.[144]  Although this evidence contradicts the ALJ's determination, the ALJ determined

that the minimum findings in the record did not support the degree of pain that Ramirez testified

he experienced, observing that no evidence existed of serious muscular weakness, atrophy,

medical joint motion, muscle spasm, sensory loss, or other physical deterioration.[145]  I agree.  No

evidence other than Ramirez's testimony indicates that he has no ability to perform work.

Ramirez complains that the ALJ did not consider his low average range of intellectual

functioning and how that would impact his ability to do such work as payroll clerk and

switchboard operator.  Ramirez's IQ scores were part of Dr. Connolly's assessment.  Dr.

Connolly administered the Wechsler Adult Intelligence Scale - Third Edition and reported that

Ramirez scored as follows: verbal IQ - 87, performance IQ - 94, and full scale - 89.[146]  Dr.

Connolly stated that these scores show that Ramirez has moderate cognitive ability for training

and employment opportunities.[147]  For academic achievement, Ramirez scored 70 (grade

equivalent of 5.2) in reading, 79 (grade equivalent of 6.4) in spelling, and 83 (grade equivalent of

6.9) in arithmetic.[148]  Dr. Connolly stated that these scores range from the Low Average to the

---

[143]*Id.*

[144]*Id.* at p. 503.

[145]*Id.* at p. 17.

[146]*Id.* at p. 401.

[147]*Id.*

[148]*Id.* at p. 402.

Borderline IQ levels.  Although the ALJ did not specifically address these scores in his decision, the ALJ's step-five determination reflects these scores by reflecting Dr. Connolly's findings about Ramirez's mental ability to do work-related activities—i.e., slight restriction in the ability to understand and remember short, simple instructions; slight restriction in the ability to carry out short simple instructions; moderate restriction in the ability to understand and remember detailed instructions; marked restriction in the ability to carry out detailed instructions; and moderate restriction on the ability to make judgment on simple work-related decisions.

Ramirez also complains that the ALJ failed to consider the findings of VA psychiatrists. Ramirez specifically complains that the ALJ did not consider Dr. Vroni Hetherly's note that he was tearful, and looked anxious and depressed at his first post-traumatic stress disorder session on April 27, 2005.[149]  Dr. Hetherly's note, however, indicates that she did not perform a formal examination.[150]  The notes also indicate that Ramirez had not had a consultative appointment for post-traumatic disorder.[151]  Nothing in Dr. Hetherly's notes of that first contact suggests that Ramirez's has limitations that prevent him from performing all work.

Ramirez also criticizes the ALJ for failing to comment about the effect of fatigue and lack of sleep on his ability to work.  Ramirez, however, does not identify evidence about fatigue or the lack of sleep that the ALJ should have considered, or explain why the ALJ failed in this regard. My review of the record does not suggest Ramirez has previously relied on fatigue or the inability to sleep as the basis for disability.  Instead, he has always relied on back, hip and leg

---

[149]*See id.* at p. 441.

[150]*Id.*

[151]*Id.*

injuries.[152]

Ramirez also complains that the hypothetical question posed by the ALJ to the vocational expert did not include all of his impairments.  He complains specifically that the ALJ's question did not include his low average intellectual functioning with deficiencies in verbal and computational areas and his limited ability to concentrate, persist, and keep pace.  A proper hypothetical question posed to a vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ.[153]

The ALJ's hypothetical question follows:

. . . [A]ssume an individual 44 years of age with a high school education, past work as you've just described to me as an aircraft mechanic performing medium skilled work.  Assume further that this person would be, despite his impairments, could lift 20 pounds occasionally and 10 pounds frequently, could stand and walk at least two hours in an eight hour work day, would have no limitations sitting, he would be limited in lower extremities in pushing and pulling based on the abnormal EMG.  He can never do any climbing, he could occasionally balance, kneel, crouch, crawl, stoop.  There would be no reaching or manipulative limitations, no visual acuity limitations, no environmental limitations.  That's from the physical side.  In addition to those limitations this gentleman also has a major depression disorder and based on that he would have these following additional limitations from a mental standpoint. . . . [T]his individual would have slight limitations understanding and remembering short, simple instructions and carrying them out, moderate limitations understanding and remembering detailed instructions, marked limitations carrying out detailed instructions, moderate limitations in the ability to make judgements on simple work related decisions. This person would also have moderate limitations interacting appropriately with

---

[152]*See id.* at p. 75.

[153]*See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994) ("Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand.").

the public, slight limitations with supervisors and co-workers, marked limitations responding appropriately to work pressures in a unusual [sic] work setting, and moderate limitations responding appropriately to changes in a routine work setting.  Would a person, obviously this is, physically alone he is, we'd eliminate the past work, am I correct? . . . Would the skills required for past work be transferrable to jobs within the profile I've just given you? . . . Would there be any unskilled jobs available to individuals with this profile? . . . [154]

This question is proper because it reasonably incorporates all of the disabilities recognized by the ALJ.  Although Ramirez suggests that it is improper because the question is based on a person who graduated from high school rather than on his IQ scores showing a low average intellectual functioning with deficiencies in verbal and computational areas, the question is proper because the record shows that Ramirez has a high school equivalent degree and completed one year of college,[155] and because the question incorporates the mental limitations indicated by Dr. Connolly in his psychological assessment.  Ramirez also suggests the question is improper because it does not include limited ability to concentrate, persist, and keep pace, but the question is proper because it incorporates the mental limitations supported by the record—specifically, by Dr. Connolly's psychological assessment.

Finally, Ramirez complains that the ALJ did not assess his ability to maintain work.  The ALJ is not required to make an explicit finding about whether the claimant can maintain employment in every case.[156]  In most cases, the ability to perform work on a regular and

---

[154]SSA record, pp. 493-94.

[155]*Id*. at p. 81 (Ramirez reporting his education).

[156]*See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (clarifying that *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002) does not require an explicit finding in every case about whether a claimant can maintain employment).

continuing basis is inherent in the definition of residual functional capacity.[157]  Ramirez did not

advance an argument about why the ALJ was required to make such a determination in his case.

A determination that Ramirez can maintain employment, however, is inherent in the ALJ's

findings about the restrictions and limitations that prevent Ramirez from performing the full

range of light work.  For example, the ALJ recognized that Ramirez's restrictions in the ability to

lift and carry do not permit Ramirez to perform the full range of light work.

Substantial evidence supports the ALJ's step-five determination that Ramirez can

perform sedentary work.  In particular, Dr. Prosser's evaluation, the functional capacity

assessment, Dr. Gordon's neurological evaluation, and Dr. Connolly's psychological assessment,

support the ALJ's step-five determination.  The only evidence that indicates that Ramirez has no

ability to perform work is his own testimony which is not supported by any medical findings.

## VI.  Recommendation

Based on the foregoing, I recommend that Ramirez's request for relief (docket entry # 3)

be DENIED and that the Commissioner's decision denying Ramirez benefits be AFFIRMED.

## VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and

Recommendation on all parties by either (1) electronic transmittal to all parties represented by

attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those

not registered by certified mail, return receipt requested.  Written objections to this Memorandum

---

[157]*See Dunbar*, 330 F.3d at 672 ([A]bsent evidence that a claimant's ability to maintain
employment would be compromised despite his ability to perform employment as an initial matter,
or an indication that the ALJ did not appreciate that an ability to perform work on a regular and
continuing basis is inherent in the definition of RFC, we do not read *Watson* to require a specific
finding that the claimant can maintain employment. ).

and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[158]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[159]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[160]

       **SIGNED** on February 20, 2007.

       *Nancy Stein Nowak*

       NANCY STEIN NOWAK
       UNITED STATES MAGISTRATE JUDGE

---

[158]28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[159]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[160]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).